IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

**TRACY L. WESSEL,**

    **Plaintiff,**

vs.                                                        Case No. 1:08cv166-MP/WCS

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

    **Defendant.**

                                                  /

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed.

**Procedural status of the case**

Plaintiff, Tracy L. Wessel, applied for disability insurance benefits and supplemental security income benefits. Plaintiff was 44 years old at the time of the administrative hearing, has a 12th grade education, and has past relevant work in a

physician's office as a office manager, filing clerk, and as a certified medical assistant. Plaintiff alleges disability due to cervical pain from an injury and lower back pain.

The Administrative Law Judge found that Plaintiff was disabled from November 6, 2004, through March 8, 2006. R. 17. He also determined that Plaintiff experienced medical improvement and was not disabled thereafter. *Id.* Specifically, he found that from March 9, 2006, forward, Plaintiff had the residual functional capacity to do a full range of sedentary work, but with limitations. R. 26. Relying upon evidence from a vocational expert, the ALJ determined that Plaintiff can perform work as a charge account clerk, call out operator, and room service clerk, and thus was not disabled after that date. *Id.* The issue is whether this latter determination (effectively a determination that medical improvement warrants a termination of benefits) followed the law and was supported by substantial evidence in the record.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

   A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

Where the issue is continuation of Title II disability benefits where there has been medical improvement, the Commissioner analyzes whether benefits should continue or terminate in eight steps:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

3. Has there been medical improvement, that is, a decrease in medical severity?

4. Is the medical improvement related to the ability to work, that is, has it caused an increase in residual functional capacity based upon the impairments that were present at the time of the most recent favorable disability decision?

5. Do any of the exceptions to medical improvement found in 20 C.F.R. §§ 404.994(b)(3) and (b)(4) apply?

6. Are all of the current impairments, considered separately and in combination, severe?

7. If the impairments are severe, can the claimant still do his or her past relevant work?

8. Do the individual's impairments prevent other work?

20 C.F.R. §§ 404.1594(f)(1) through (8). The steps for determining whether Title XVI supplement security income benefits should terminate are the same, except that step one is omitted. 20 C.F.R. §§ 416.994(b)(5)(i) through (vii).

Case 1:08-cv-00166-MP-WCS   Document 17   Filed 05/07/09   Page 5 of 19

Page 5 of 19

**Legal Analysis**[1]

Plaintiff's claim is based entirely upon the medical evidence of Plaintiff's treatment after March 9, 2006. Plaintiff argues that:

> there is little if any difference in the medical opinions of Plaintiff Wessel's treating physicians, concerning Plaintiff's chronic pain, in this matter over time. And, frankly, obviously the reverse is true as shown by the ever increasing potency of Plaintiff Wessel's narcotic medications during the period [November,5, 2004,] to March 9, 2008, by which time she was on Methadone and homeless.

Doc. 12, p. 9.

Defendant argues that the ALJ's determination of substantial medical improvement is supported by notations by Dr. Leber from January 5, 2006, through November, 2006, that Plaintiff had no side effects from taking Methadone, her pain was under good control with minimal sedation, and she could ambulate independently with a steady gait, had full range of motion in all four extremities, could rise from a seated position without difficulty, and had no muscle spasms. Doc. 15, p. 6.

The question is whether there has been "any medical improvement," and whether "this medical improvement is related to [the claimant's] ability to work." § 404.1594(a). If both conditions are found, the Commissioner "must also show that [a claimant is] currently able to engage in substantial gainful activity" before a decision may be

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link). Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.

rendered that a claimant is no longer disabled. *Id.* 20 C.F.R. § 404.1594(b)(1) provides:

> (1) *Medical improvement*. Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see §404.1528).

20 C.F.R. § 404.1594(b)(1). Although it is clear that the Commissioner may terminate benefits if there has been medical improvement, "[o]nce evidence has been presented which supports a finding that a given condition exists it is presumed in absence of proof to the contrary that the condition has remained unchanged." Vaughn v. Heckler, 691 F.2d 966, 969 (11th Cir. 1984), *quoting*, *Rivas v. Weinberger*, 475 F.2d 255, 258 (5th Cir. 1973).

> We must ascertain whether the Secretary's finding of improvement to the point of no disability is supported by substantial evidence. In each case, the burden remains with the claimant to prove the existence of a disability. *Crosby v. Schweiker*, 650 F.2d 777, 778 (5th Cir. 1981). If, however, the evidence in a continuation case is *substantially the same* as the evidence had been in the initial disability benefits request case, benefits must be continued. Otherwise, termination of benefits will often depend not on a finding of changed condition, but simply on the whim of a changed ALJ.

691 F.2d at 969 (emphasis added).

The evidence bearing upon this issue is the following. According to her treating physician, Eric M. Gabriel, M.D., Plaintiff was involved in a automobile collision in early November, 2004. R. 126. Her motor vehicle was hit from behind by another vehicle causing her neck to snap forward and back. *Id.* Plaintiff developed pain in her neck

and arm, consistent with a whiplash injury.  *Id.*  A cervical MRI on November 8, 2004, shortly after the accident, revealed "multilevel degenerative disc change."

> At C4-C5, there is a slight anterolisthesis, as documented on prior CT of 11/07/04.  At this level, the disc diffusely bulges, but there is no evidence for cord compression or foraminal narrowing.  C5-C6 and C6-C7 are severely degenerated and decreased in height.  There is broad based osteophytic bar formation at both levels, which results in spinal canal narrowing.  At C6-C7, there is a lesser degree of cord flattening and there is bilateral foraminal narrowing.  No abnormal spinal cord signal.

R. 144.  The diagnostic impression was: "Multilevel degenerative cervical spondylosis[2] with spinal stenosis[3] and foraminal stenosis, most notable at C5-C6 and C6-C7."  *Id.*

On November 26, 2004, Plaintiff underwent a cervical discectomy.  R. 153.

On January 24, 2005, Plaintiff had an MRI of her lower lumbar spine.  R. 225.  This revealed a "degenerative signal loss at L4/5 and L5/S1 with discogenic vertebral end place bone marrow change at L5/S1."  *Id.*  There was also a "broad based left paracentral disk protrusion potentially impinging upon the traversing left L5 nerve root."  *Id.*  The diagnostic impression was degenerative lumbar spondylosis L4/5 and L5/S1 with potential left L5 nerve root compression."  *Id.*

On March 1, 2005, Plaintiff reported to Dr. Gabriel that she was "doing well with respect to her neck, and mainly has complaints of low back pain."  R. 122.  He noted the abnormal findings of the most recent lumbar MRI.  *Id.*

---

[2] Spondylosis is the ankylosis of a vertebral joint or degenerative spinal changes due to osteoarthritis.  Ankylosis is the immobility and consolidation of a joint due to disease, injury, or surgical procedure.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

[3] Stenosis is an abnormal narrowing of a duct or canal.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

On March 28, 2005, Plaintiff was seen by Christopher M. Leber, M.D., on referral by Dr. Gabriel. R. 182. She reported to him that she had had low back and right leg pain since her motor vehicle accident. *Id.* She said her symptoms were increasing. *Id.* Dr. Leber noted that the January 24, 2005, MRI revealed: "degenerative lumbar spondylosis L4-5, L5-S1 with potential left L5 nerve root compression. Patient has annular tear with disc bulge at L4-5 paracentral to the left and annular bulge to the right at L5-S1." *Id.* Dr. Leber observed that Plaintiff had difficulty changing from sitting to standing, had decreased range of motion of her lumbar spine, and had tenderness in the right lumbar paraspinals and into the right SI joint. R. 183. He said that Plaintiff "continues to have significant low back pain with right lower extremity paresthesias." R. 184.

Dr. Leber saw Plaintiff on April 21, 2005. R. 179. He determined that her neck "has remained fairly table, but unfortunately she has severe pain in the lumbar spine as well as RLE pain." *Id.* Ultracet[4] was not helping the pain. *Id.* He observed that she had difficulty going from sitting to standing, and she had paresthesias persisting in the

---

[4] Ultracet is a trademark for a preparation of tramadol hydrochloride and acetaminophen. DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS. Ultracet is used to treat moderate to severe pain for a period of five days or less. It contains two pain-relieving agents. Tramadol, known technically as an opioid analgesic, is a narcotic pain reliever. Acetaminophen is the active ingredient in the over-the-counter pain remedy Tylenol. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Case No. 1:08cv166-MP/WCS

right lower extremity.  *Id*.  He prescribed physical therapy, Tizanidine,[5] and Hydrocodone.[6]  R. 180.

Plaintiff's medications were continued over the succeeding months, with an increase of Hydrocodone on August 25, 2005.  R. 176, 174, 170.  Percocet[7] was substituted for Hydrocodone on September 21, 2005.  R. 168.  Percocet was discontinued on October 19, 2005, and Kadian (MS Contin)[8] was substituted.  R. 166.  On November 4, 2005, Dr. Leber changed MS Contin to Methadone.[9]  R. 163.  Dr. Leber continued to prescribe Methadone on December 5, 2005, January 5, 2006, and March 9, 2006, with an increased dosage on March 9, 2006.  R. 162, 160, 157.

---

[5] Tizanidine is the generic name for Zanaflex.  Zanaflex relaxes the tense, rigid muscles caused by spasticity.  It is prescribed for people with multiple sclerosis, spinal cord injuries, and other disorders that produce protracted muscles spasms.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[6] Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

[7] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[8] Kadian is brand of MS Contin.  MS Contin, a controlled-release tablet containing morphine, is used to relieve moderate to severe pain.  While regular morphine is usually given every 4 hours, MS Contin is typically taken every 12 hours – only twice a day.  The Kadian brand may be taken once or twice a day.  The drugs are intended for people who need a morphine painkiller for more than just a few days. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[9] Methadone is a synthetic opioid analgesic with pharmacologic properties similar to those of morphine and heroin and equal potential for addiction; used as an analgesic and as a substitute opiate in the treatment of heroin addiction.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

On October 19, 2005, Dr. Leber noted that Plaintiff had difficulty changing from sitting to standing, ambulated with a steady but stiff gait, motion of the lumbar spine increased discomfort, had tenderness in her lumbar paraspinals, had active motion in all four extremities, and had paresthesias in the right lower extremity.  R. 165.

On November 4, 2005, Dr. Leber noted that continued to have "ongoing musculoskeletal pain with paraesthesias, and impaired sleep," and "motion of the lumbar spine is limited and increases discomfort."  R. 163.  Plaintiff denied any adverse effects from use of Methadone except for constipation.  *Id.*

On December 5, 2005, Dr. Leber said that Plaintiff had an antalgic gait favoring the right lower extremity, changed from sitting to standing with difficulty, she still had paresthesias, and the motion of her spine was still limited and increased discomfort.  R. 161.  He said "she is currently doing well with her medications."  *Id.*

On January 5, 2006, Plaintiff told Dr. Leber that her pain had not changed.  R. 159.  Dr. Leber noted in his "review of symptoms" that Plaintiff was "significant for ongoing musculoskeletal pain."  *Id.*  She was in no severe distress, could rise from sitting to standing without significant difficulty, ambulated independently with a steady gait, but the motion of her lumbar spine "remains limited and increases her discomfort."  *Id.*  She had active motion of all four extremities.  *Id.*

The ALJ determined that Plaintiff had experienced substantial medical improvement after March 8, 2006, and thus the medical notes after that date must be closely compared with those set forth above.

On March 9, 2006, Plaintiff reported to Dr. Leber that she was having "some difficulty getting the correct dose of Methadone that would help her without making her

too sedated." R. 157. He noted that using "15 mg t.i.d. – this amount kept her sedation to a minimum and kept her pain under good control with no side effects being reported." *Id.* Plaintiff was able to rise from a seated position without difficulty. *Id.* "Motion of the cervical spine increases the pain to some degree, but she maintains functional motion in all four extremities." *Id.* Dr. Leber found Plaintiff to be "otherwise neurologically stable." *Id.* The dosage of Methadone was changed to 10 mg, 1 1/2 tablets t.i.d., and she was to return in one month to see how this worked. *Id.*

On April 7, 2006, Plaintiff returned to Dr. Leber. R. 219. She was having increased lumbar pain because she had a cough. *Id.* She was using her medications (Methadone and Tizanidine) properly. *Id.* She was alert, oriented, and in no acute distress, and could ambulate independently. *Id.* She had active functional motion in upper and lower extremities, but with diffuse tenderness in her spine without severe spasms. *Id.*

On May 8, 2006, Dr. Leber found that Plaintiff's gait was slow but steady, she ambulated independently, she had some difficulty going from sitting to standing, and he noted that changes of position caused increased her lumbar pain. R. 218. Plaintiff said that she had attempted to work for two weeks in a sedentary position, but said that "the pain was too much for her. She cannot tolerate it and will not be continuing it." *Id.* Dr. Leber increased the dosage of Methadone, discontinued Tizanidine, and began Methocarbamol.[10] *Id.*

---

[10] Methocarbamol is the generic name for Robaxin. Robaxin is prescribed, along with rest, physical therapy, and other measures, for the relief of pain due to severe muscular injuries, sprains, and strains. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On June 5, 2006, Dr. Leber said that Plaintiff was "doing fairly well overall." R. 217. Plaintiff said that she was using half the dose for the Methocarbamol because it was causing a hangover effect in the morning, and that the Methadone was helpful without side effects. *Id.* Dr. Leber found her to be in no acute distress, her mobility was independent, and said: "She demonstrates no new neurologic abnormalities at this time." *Id.* He continued his diagnosis of low back pain with spondylosis and right S1 joint pain. *Id.*

On July 5, 2006, Plaintiff reported that she had fallen the night before, and her "limbs are sore today." R. 215. Her ambulation remained "independent." *Id.* Again, no new neurological deficits were noted, and her diagnosis remained the same. *Id.*

On July 31, 2006, Plaintiff returned to Dr. Leber "for follow up for chronic pain secondary to cervical fusion with ongoing cervicalgia." R. 213. Plaintiff said she had had a "fairly uneventful month." *Id.* Her days were intermittently good and bad. *Id.* "Her pain medication is controlling her pain most of the time, but she will have days that it is not." *Id.* She reported suffering from insomnia, sleeping only two to three solid hours a night. *Id.* She rated her pain at 5 to 7 on a scale of 10. *Id.* Plaintiff was taking Methadone and Tizanidine with no side effects. *Id.* She was found to be alert and in no severe distress. *Id.* On examination, Plaintiff had "moderate discomfort rising from a sitting to a standing position." *Id.* Plaintiff had tenderness in the left hip due to sciatic discomfort, and had some tingling and numbness in the left upper thigh radiating to her left foot. *Id.*

On August 31, 2006, Plaintiff again saw Dr. Leber. R. 212. Her medications were continued, and no change in her condition was reported. *Id.*

Case No. 1:08cv166-MP/WCS

On September 28, 2006, Dr. Leber said that Plaintiff changed from sitting to standing without difficulty, was in no severe distress, and had no side effects from using Methadone and Tizanidine. R. 211.

On October 26, 2006, Plaintiff reported to Dr. Leber that she was "overall the same." R. 210. Dr. Leber's findings are the same as the prior month. Id.

On November 27, 2006, Plaintiff reported to Dr. Leber that she had fallen two days earlier and injured her right knee. R. 208. Plaintiff reported that she had more low back and cervical pain since the fall. Id. On examination, Dr. Leber found that Plaintiff had great difficulty rising from a seated position and was unsteady even with use of a cane. Id. He observed that she was having muscle spasms as he examined her. Id. He noted "[t]enderness to palpation to the mid to lower lumbar region extending into the paraspinals." Id. Plaintiff reported to Dr. Leber that she could sit, stand, or walk only at 15 minute intervals, and could not lift more than 10 pounds occasionally. R. 209.

On January 9, 2007, Plaintiff returned again to see Dr. Leber. R. 206. She had missed her October 21, 2006, appointment due to car troubles. Id. She was having increased difficulty with ambulation. Id. She rated her pain at 7 to 9 out of 10. Id. She continued to deny experiencing side effects from taking Methadone and Tizanidine. Id. On examination, Dr. Leber found that Plaintiff had an impaired gait, that her gait was unsteady, but she did not need an assistive device. Id. She continued to experience muscle spasms during the examination. Id. It was noted that she had full active range of motion of all four extremities, but with an unknown[11] but apparent limitation noted in

---

[11] Page 206 of the record was copied with a folded page in the lower lefthand corner, obscuring the nature of this apparent limitation.

the lower extremities.  *Id*.  Use of cocaine and marijuana was detected in a drug screen on January 9, 2007.  R. 207.  As a consequence of Plaintiff's illicit drug use, Methadone was discontinued.  *Id*.

The ALJ's determination that Plaintiff's pain was "under good control" after March 9, 2006, and did not cause side effects, is not substantial evidence in the record to find that she had experienced medical improvement.  Plaintiff's medications were increased in strength by her treating physician until by November, 2005, when Methadone was prescribed.  She continued on Methadone without any side effects, either before or after the date the ALJ said that she was no longer disabled, and during this entire period it seems that her pain was under reasonable control.  Methadone was discontinued in January, 2007, due to a positive drug test for use of cocaine and marijuana, not because Plaintiff's pain had subsided due to medical improvement.  The history of medications is only evidence that Plaintiff experienced serious pain on a continuous basis both before and after March 9, 2006.  Likewise, it appears that during the entire period, Plaintiff had no significant adverse side effects of the pain medications, except for some sedation which was alleviated by lowering the dose of Methadone.

The other objective findings by Dr. Leber appear to be much the same both before and after March 9, 2006.   On October 19, 2005, Dr. Leber noted that Plaintiff had difficulty changing from sitting to standing, ambulated with a steady but stiff gait, motion of the lumbar spine increased discomfort, had tenderness in her lumbar paraspinals, had active motion in all four extremities, and had paresthesias in the right lower extremity.  R. 165.  On January 5, 2006, two months before the date that the ALJ found that Plaintiff was no longer disabled, Dr. Leber noted that Plaintiff was "significant

for ongoing musculoskeletal pain," was in no severe distress, could rise from sitting to standing without significant difficulty, ambulated independently with a steady gait, had active motion of all four extremities, but the motion of her lumbar spine remained limited and increased her discomfort.  R. 159.  On April 7, 2006, a relatively good day, Plaintiff was having increased lumbar pain, was using her medications properly, was alert, oriented, and in no acute distress, could ambulate independently, had active functional motion in upper and lower extremities, but had diffuse tenderness in her spine without severe spasms.  R. 219.  On May 8, 2006, Dr. Leber found that Plaintiff's gait was slow but steady, she ambulated independently, she had some difficulty going from sitting to standing, changes of position caused increased her lumbar pain.  R. 218.  Plaintiff said that she had attempted to work for two weeks in a sedentary position, but said that "the pain was too much for her.  She cannot tolerate it and will not be continuing it."  *Id.*  Dr. Leber did not disbelieve Plaintiff, but instead increased the dosage of Methadone.  *Id.*

June 5, 2006, was another relatively good day.  Dr. Leber said that Plaintiff was "doing fairly well overall," was in no acute distress, and her mobility was independent.  R. 217.  On July 31, 2006, Plaintiff said that her pain medication controlled her pain most of the time, but she had bad days, and Dr. Leber found that had she had "moderate discomfort rising from a sitting to a standing position," and had some tingling and numbness (the same paresthesias as before March 9, 2004) in the left upper thigh radiating to her left foot.  R. 213.  The findings on August 31, 2006, September 28, 2006, and October 26, 2006, do not report any significant change in her condition, except that she had no difficulty rising from a seated position on September 28th.  R. 212, 211, 210.

Case No. 1:08cv166-MP/WCS

The findings changed for the worse due to a fall on November 27, 2006.  R. 208. Dr. Leber found that Plaintiff had great difficulty rising from a seated position, was unsteady even with use of a cane, had muscle spasms, and had spinal tenderness to palpation.  R. 209.  On January 9, 2007, Plaintiff was having increased difficulty with ambulation, continued to deny experiencing side effects from taking Methadone, had an impaired unsteady gait, had muscle spasms, but had full active range of motion of all four extremities.  R. 206.

In summary, the medical record before and after March 9, 2006, does not contain substantial evidence to support the ALJ's conclusion that after March 9, 2006, Plaintiff experienced substantial medical improvement.  The evidence both before and after that date reflects that Plaintiff's condition remained unchanged.

Defendant also argues that the decision to terminate benefits was supported by evidence of Plaintiff's daily activities.  Doc. 15, p. 7.  Defendant argues that there was evidence that Plaintiff could take care of her personal hygiene, cook simple meals, wash dishes, do laundry, drive a motor vehicle, and attend parties.  *Id*.

The only evidence of the extent of Plaintiff's daily activities is from Plaintiff herself, and she testified that those activities were significantly limited.  Plaintiff testified that she drove her car once a week from Gainesville to Archer, Florida, to get her mail. R. 233-234.  She still owns the truck in which she had her accident, and said she drives for short distances.  R. 242.  She drove to the hearing that day.  R. 243.  Plaintiff testified that in the morning she cooks eggs, takes her medication, tries to stretch, feeds her dog, tries to wash her dishes, and does some laundry.  R. 246-247.  She said that after washing dishes for ten or fifteen minutes, she has such pain that she has to lie

down.  R. 251.  She said that it takes all day to do "little menial things."  R. 247.  She does laundry at a laundromat and sometimes has to ask for help to take the clothes out.  *Id*.  She shops for food with a friend.  *Id*.  She spends a lot of time lying down, frequently changing positions.  R. 251.

Also relevant to the extent of Plaintiff's daily activities, Plaintiff testified that she is in constant pain in her lower back if she stands or sits for too long.  R. 243.  She said that when she stands, it felt as though something was pinched and she would fall.  R. 246.  She said that she could not do long term sitting or standing.  *Id*.  The longer she sits, "the harder it is to get the body moving and out of pain again."  R. 252.  She said that the pain went down her back and right leg.  R. 245.  She said her neck was "a little stiff" after the surgery, and she said it hindered the movement or her arm.  R. 244.  She said that her medication impaired her cognitive abilities, and that she was then (March 7, 2007) taking Tramadol again (Ultracet or Ultram).  *Id*.  She said that her memory was impaired, and she did not trust herself as a result of her pain medication.  R. 252.

Plaintiff testified that the day before the car accident, she worked as an office manager for a physician.  R. 236-237.  She also sometimes gave injections since she is a certified medical assistant and assisted in office surgeries.  *Id*.  After the accident, she tried to work in a sedentary job, answering the telephone and using a computer, but said that after two weeks, she found that she could not do that work.  R. 249.  She was allowed to sit or stand in this job.  R. 249-250.  She only worked about two hours a day during this two week trial period.  R. 250.  During the rest of the six hours, she walked and stretched, trying to alleviate the discomfort.  *Id*.

Case No. 1:08cv166-MP/WCS

The daily activities described above by Plaintiff are not substantial evidence to support the conclusion that after March 9, 2006, Plaintiff experienced substantial improvement in her impairments.  Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (when considering daily activities, the entire record must be considered, including the claimant's testimony that she had to lie down after two hours of such work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing).

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly follow the law and were not based upon substantial evidence in the record.  The decision of the Commissioner to terminate Plaintiff's benefits should be reversed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner **ORDERED** to reinstate Plaintiff's disability benefits effective March 9, 2006.

**IN CHAMBERS** at Tallahassee, Florida, on May 7, 2009.


                                                s/    William C. Sherrill, Jr.
                                                **WILLIAM C. SHERRILL, JR.**
                                                **UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**